**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TENDEKA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1764 |
| | § | |
| NEIL GLOVER, *et al.* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

On September 17, 2013, Tendeka, Inc. moved to disqualify Boyar Miller, P.C. from representing defendants Neil Glover and Swell X, Ltd.  On March 12, 2014, the court dismissed Neil Glover from the suit, without prejudice, for lack of personal jurisdiction.  (Docket Entry No. 50). Boyar Miller continues to represent Swell X.  At the March 24, 2014 status conference, Tendeka stated its intent to pursue Boyar Miller's disqualification.

Based on the motion to disqualify, the response, and reply, the record, and the relevant law, the court grants the motion to disqualify.  The reasons for this ruling are explained below.

I.    **Background**

A.    **Procedural Posture**

On June 17, 2013, Tendeka, Inc. sued Neil Glover, Swell X, Ltd., and Elite Elastomers, Inc. alleging breach of contract and tortious interference with contract.  Neil Glover moved to dismiss the claims asserted against him in the amended complaint for lack of personal jurisdiction.  (Docket Entry No. 14).  Neil Glover and Swell X moved to dismiss based on forum non conveniens or alternatively for abstention, and to dismiss for failure to state a claim.  (Docket Entry Nos. 10, 12).

Elite did not join these motions or otherwise challenge the pleadings.

The court granted Glover's motion to dismiss for lack of personal jurisdiction. The court also denied Swell X's motion to dismiss based on forum non conveniens, granted in part and denied in part the motion to dismiss for failure to state a claim, and denied the motion to abstain. The result was that the claims against Glover were dismissed without prejudice, and the claims against Swell X and Elite—other than the claim for tortious interference with other customer contracts—remained.

### B.    The First Amended Complaint

The following factual allegations come from the first amended complaint. They were summarized in this court's prior Memorandum and Opinion but are repeated briefly for convenient reference.

Tendeka B.V., a Netherlands company, owns two subsidiaries, Swellfix UK, Ltd. and the plaintiff, Tendeka, Inc. ("Tendeka"). (FAC ¶ 15). Tendeka is a Delaware corporation with its principal place of business in Houston, Texas. (FAC ¶ 1). Tendeka is responsible for Tendeka B.V.'s United States operations. Tendeka develops and manufactures rubber devices called "swellable packers" that are used for oil-and-gas fracking. (FAC ¶ 10).

Producing swellable packers requires several steps. (FAC ¶ 11). The first is a "unique array of ingredients [are combined] to generate an elastomer compound." (*Id.*). In the second step, the compound is "vulcanised" by exposure "to a very specific level of heat, for a period of time that is just as specific." (*Id.*). Finally, the elastomer compound is added to a pipe. (*Id.*). Tendeka compartmentalizes this process by using separate suppliers to make and vulcanise the elastomer compound and to add it to the pipe. (FAC ¶ 12).

Elite Elastomers, Inc. is incorporated and has its principal place of business in Mississippi.

2

(FAC ¶ 4).  On October 30, 2009, Tendeka and Elite entered into a License and Supply Agreement (LSA).  (FAC ¶ 7).  Under the LSA, Elite "agreed to manufacture for Tendeka the elastomer compounds used to make [Tendeka's] swellable packers."  Because this required access to Tendeka's "'proprietary formulations'" and other confidential information, the LSA included "confidentiality provisions" and an "exclusivity clause that permitted Elite to sell the elastomer compounds to Tendeka alone."  (FAC ¶ 13).  The LSA permitted Elite to develop other elastomer compounds but put the "burden on Elite to prove that the 'information was developed by it without use of [Tendeka's] confidential information, as evidenced by contemporaneous documents.'"  (*Id.* (citing LSA ¶ 10(b)).  Elite was also prohibited from "attempting to reverse engineer Tendeka's intellectual property."  Elite was not set up to perform the manufacturing steps other than generating the compound.  That is, Elite was not equipped to vulcanise the compound or put the compound onto pipes.  These limits were consistent with Tendeka's compartmentalization strategy.  (*Id.* at ¶ 14).

Neil Glover, a Scotland resident and United Kingdom citizen, (FAC ¶ 2), worked for Swellfix UK Ltd. as a Product Line Manager.  (FAC ¶ 15).  Glover's job was promoting swellable packers and acting as a liaison to Tendeka's component suppliers.  (*Id.*)  Glover "dealt with Elite," was "aware of the terms" of the LSA, "negotiated an amendment" to the LSA, and was also aware that Tendeka's swellable-packer formula was proprietary.  (FAC ¶ 16).  Glover knew the limits of Elite's knowledge of the manufacturing process and how it worked.  (*Id.*).  He also knew that other suppliers besides Elite were responsible for the later steps in the manufacturing process.

After leaving Swellfix, Glover formed a new swellable-packer company, Swell X, a Scottish entity.  Swell X's North American sales manager is in Houston, Texas.  (FAC ¶¶ 3, 18).  Tendeka alleged in this action that Neil Glover formed Swell X "to engage in the manufacture and sale of

swellable packers [and that, with] Glover's assistance, Elite secretly began working to manufacture elastomer compounds using Tendeka's proprietary formulations and, then, to vulcanise them into a facsimile of the Company's swellable packers." (*Id.*). "In an effort to circumvent its contractual obligations under the LSA with Tendeka, Elite set up a separate company specifically for this purpose . . . which was to manufacture packers based on Tendeka's confidential information [and] repeatedly denied any involvement with Glover following his departure from Tendeka." (*Id.*). Although Glover owns most of Swell X's stock, principals of Elite invest in Swell X through a company named LSJ Holdings, LLC. (*Id.*).

Tenedka alleged that it conducted an internal investigation after Glover left Swellfix and set up Swell X. This investigation "revealed that Glover had downloaded from the Company's servers a wide range of confidential information, the vast majority of which was wholly unnecessary to his job duties at Tendeka, but almost all of which would be enormously useful in the event Elite was preparing to strike out on its own and make a play for a piece of Tendeka's market share." (FAC ¶ 23). Tendeka alleged that "when Glover and Swell X tapped Elite to manufacture swellable packers based on proprietary formulations and processes belonging to the Company, they induced Elite to breach both (i) its confidentiality obligations under the LSA; and (ii) its obligations, under the same agreement, to sell swellable packers – which incorporate Tendka's proprietary technology and know-how – exclusively to the Company." (FAC ¶ 25).

In the first amended complaint, Tendeka asserted causes of action for breach of the LSA and tortious interference with contractual relations. Tendeka alleged that Elite breached the LSA's confidentiality and exclusivity provisions. Tendeka claimed that Elite was "aware that information supplied to it by Glover was confidential and proprietary" and used this "proprietary and

confidential information to manufacture swellable packers for Glover and his company," Swell X. (FAC ¶¶ 29, 30).

Tendeka asserted the claims for tortious interference with contractual relations against all the defendants—Glover, Swell X, and Elite.  Tendka alleged that they "willfully and intentionally interfered with [Tendeka's contractual] relationships by offering to sell to [various oilfield services companies] swellable packers that [they] produced – in violation of the LSA – using confidential and other proprietary information[.]"[2]  (FAC ¶ 34).  Tenedka also alleged that all the defendants "willfully and intentionally induced Elite to breach" the contract obligations it owed Tendeka.  (FAC ¶ 35).  Tendeka sought damages and a preliminary injunction against the defendants' continued production, marketing, and sale of swellable packers.  (FAC ¶¶ 36-43).

## III.    The Motion to Disqualify Boyar Miller

Tendeka moved to disqualify Boyar Miller from representing Swell X because the law firm had previously worked with Tendeka to draft the LSA.  (Docket Entry No. 20).  Tendeka argues that Boyar Miller is conflicted from representing a client sued for tortiously interfering with a contract it helped draft.  Tendeka argues that the tortious-interference claim substantially relates to Boyar Miller's prior representation of Tendeka, requiring disqualification.

Boyar Miller and Swell X respond that the present action does not put at issue the terms of the LSA Boyar Miller helped draft on Tendeka's behalf, and that the LSA was amended after Boyar

---

[2] Though the amended complaint appeared also to assert that the defendants interfered with contracts Tendeka had with various customers, Tendeka's briefing on the motions made clear that they are pursuing only claims for breach of, and tortious interference with, the LSA.  Glover and Swell X moved to dismiss the complaint for failing to identify the oilfield companies Swell X contacted and how that amounted to tortious interference.  Tendeka did not respond to that argument and characterized the tortious interference claim as one for interference with the LSA.  To the extent it was asserted, the court earlier dismissed Tendeka's claim that Swell X interfered with unspecified customer contracts.  (Docket Entry No. 50).

Miller's drafting work.  The arguments and responses are analyzed below.

### A.      The Legal Standard for Disqualification

"Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992).  "[A]lthough the district court should determine rules for the conduct of attorneys for the purpose of identifying conduct subject to sanctions, its local rules alone cannot regulate the parties' rights to counsel of their choice." *Id.*  "When presented with a motion to disqualify counsel in a more generic civil case, [the Fifth Circuit] consider[s] the motion governed by the ethical rules announced by the national profession in the light of the public interest and the litigants' rights." *Id.* (citations omitted).  The "source for the standards of the profession has been the canons of ethics developed by the American Bar Association," and the Fifth Circuit looks carefully at the "admonition of canon 9 that lawyers should 'avoid even the appearance of impropriety.'" *Id.* (citations omitted).

The Texas Disciplinary Rules, which the Southern District of Texas has adopted, are also relevant.  *See* Local Rules, Rule of Discipline 1A-B; *see also In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) ("Since the relevant ABA Rules do not differ materially from the corresponding Texas Rules, the parties' interpretations of the Texas Rules are equally applicable in this case [and the] discussion will therefore center on the Texas Rules.").  Texas Rule 1.09 states:

> (a)  Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
> > (1) in which such other person questions the validity of the lawyer's services or work product for the former client;
> > (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [regarding disclosure of confidential information]; or

6

(3) if it is the same or substantially related matter.

*John Crane Prod. Solutions, Inc. v. R2R & D, LLC*, No. 3:11-cv-3237-D, 2012 WL 3453696, at *2 (N.D. Tex. Aug. 14, 2012) (quoting Tex. Disciplinary R. Prof'l Conduct 1.09(a)).

"In cases involving an alleged conflict of interest due to one party's attorney's prior representation of the other party, the Fifth Circuit applies a substantial relationship test: '[a] party seeking to disqualify opposing counsel on the ground of former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations.'" *Id.* (citing *Am. Airlines*, 972 F.2d at 614). "A substantial relationship exists when the prior representation concerns the particular practices and procedures which are the subject matter of [the] suit." *Am. Airlines*, 972 F.2d at 614 (quotation omitted). "[A] substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent." *Id.* (quotation omitted).

This does not mean that the moving party "need[s to] prove that the past and present maters are so similar that a lawyer's continued involvement threatens to stain the trial." *Id.* at 616. The moving party "need only to show that the matters embraced within the pending suit are substantially related to the matters or causes of action wherein the attorney previously represented him." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981). Matters are substantially related if they are "akin to the present action in a way reasonable persons would understand as important to the issues involved." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1346 (5th Cir. Unit A Oct. 1981).

7

"Once it is established that the prior matters are substantially related to the present case, 'the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation.'" *Am. Airlines*, 972 F.2d at 614 (quoting *Duncan*, 646 F.2d at 1028; *Corrugated Container*, 659 F.2d at 1347). "[B]ecause the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences." *Id.* at 619 (emphasis original). "[T]he provision of legal advice on a substantially related matter by itself requires disqualification." *Id.* "This is true even in cases where there is no chance that confidential information might be used against the former client, since '[a] client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the clients in the same matter.'" *John Crane*, 2012 WL 3453696, at *3 (quoting *Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979)).

## B.    Analysis

In October 2009, Boyar Miller assisted Tendeka in drafting an earlier version of the LSA. In this case, filed on June 17, 2013, Boyar Miller represents Swell X in defending against Tendeka's claim that it tortiously interfered with the LSA. Tendeka's claim is based on the allegation that Swell X "willfully and intentionally induced Elite to breach its obligation to sell swellable packers incorporating Tendeka's proprietary technology and know-how" only to Tendeka." FAC ¶¶ 34–35.

To establish a claim for tortious interference with an existing contract under Texas law, Tendeka must show "(1) the existence of a contract subject to interference, (2) willful and intentional interference, (3) that proximately causes damage, and (4) actual damage or loss." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App. –Fort Worth 2009). "For a

plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under the contract." *Id.* at 532. "The plaintiff must present evidence that a contract provision was breached." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 674–75 (S.D. Tex. 2010) (citing *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App. –Austin 2003, no pet.)); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App. –Texarkana 1999, pet. denied). "Like contract interpretation, tortious interference with contract is a mixed question of law and fact." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995).

Tendeka has met its burden of showing that Boyar Miller should be disqualified. To prevail on the tortious interference claim, Tendeka must show that the contract was breached. Boyar Miller will be arguing that its current client, Swell X, did not cause Elite to breach the contract Boyar Miller had previously helped draft on Tendeka's behalf. Defending the tortious-interference claim will likely require interpreting the LSA provisions that Elite allegedly breached. That interpretation is likely to require examining how Swell X's actions affected Elite's performance under these provisions of the LSA. Boyar Miller is in a position to exploit the knowledge it gained in drafting the allegedly breached contract language. The substantial-relationship test appears to be satisfied.

Boyar Miller argues that Swell X's liability turns on "pure" questions of fact and will not require the parties or the court to construe the LSA. The problem with this argument is that tortious interference with contract is a mixed question of law and fact. The plaintiff, Tendeka, must show that the LSA was in fact breached by Elite in order to show that Swell X is liable for tortious interference in the contract between Elite and Tendeka. The analysis is likely to involve interpreting the LSA confidentiality terms that Boyar Miller helped draft. *See Rimkus Consulting Grp.*, 688 F.

Supp. 2d at 674–75.  Tendeka has shown that interpreting and applying the LSA confidentiality provisions that Boyar Miller helped draft, including the terms "independent development" and "contemporaneous documents," will be relevant in determining the viability of the claim for tortious interference with the LSA.

Boyar Miller also argues that the operable LSA is a different, amended version of the LSA that it assisted in drafting.  But Tendeka has shown that the amendment to the LSA added only a brief rider that modified paragraphs not at issue in this litigation.  The amended LSA was otherwise not significantly changed.  Boyar Miller helped draft the LSA provisions that are the basis of the claims Tendeka asserts in this action.  Tendeka has presented evidence that Boyar Miller drafted the confidentiality provisions at issue in this litigation and that Boyar Miller was designated as the party to receive all notices and information regarding the agreement.  The record shows that Boyar Miller drafted for its former client, Tendeka, the LSA language that Elite allegedly breached and that its present client, Swell X, allegedly interfered with.

Because both parts of the substantial-relationship test are met, the motion to disqualify is granted.  Swell X has until July 11, 2014, to retain new counsel and have that new counsel file an appearance in this case.

SIGNED on May 15, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge