**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TENDEKA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-1764 |
| | § | |
| NEIL GLOVER, *et al.* | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Tendeka, Inc. sells swellable-rubber packers for use in oil and gas downhole drilling.  Elite Elastomers, Inc., supplied Tendeka with swellable rubber used to make the swellable packers Tendeka sold.  Tendeka alleges that Elite breached the confidentiality provisions of their License and Supply Agreement ("LSA") by using Tendeka's proprietary swellable-rubber formulations to accelerate Elite's development of a swellable packer for a Tendeka competitor, Swell X.  Elite has counterclaimed against Tendeka, alleging that it breached the LSA by replacing Elite as its swellable-rubber supplier.

Tendeka also sued Swell X and its president, Neil Glover, formerly a Tendeka employee, alleging tortious interference with the LSA and breach of Glover's employment contract.  The court dismissed Tendeka's claims against Glover in a prior memorandum and opinion. (Docket Entry No. 50).

Five summary judgment motions are pending. This memorandum and opinion addresses the following motions:

- Elite's motions for partial summary judgment dismissing Tendeka's breach-of-

1

contract claim, based on the arguments that (1) Tendeka did not have an exclusive license to use the rubber compounds formulations SwellFix obtained under its agreement with Shell and then provided to Tendeka, (Docket Entry No. 69), (2) the formulations are not protected as confidential information under the LSA, and (3) the LSA's confidentiality provisions do not cover certain rubber compounds formulations because they were publicly known, (Docket Entry No. 72);

- Elite's motion for partial summary judgment granting its breach-of-contract counterclaims against Tendeka, based on the arguments that Tendeka (1) failed to meet the LSA's requirement to purchase 90% of its rubber needs from Elite, (2) worked with another rubber supplier, and (3) did not pay Elite on time, (Docket Entry No. 76);

- Tendeka's motion for partial summary judgment dismissing Elite's breach-of-contract counterclaims, based on the arguments that (1) Elite breached the LSA, (2) the LSA precludes the lost-profits damages Elite seeks, and (3) the parties agreed to terminate the LSA in July 2013, (Docket Entry No. 78);

- Swell X's motion for partial summary judgment dismissing Tendeka's tortious-interference claims, based on the arguments that (1) Tendeka failed to present sufficient evidence that Swell X induced Elite to violate the LSA's confidentiality provisions, and (2) the affirmative defense of justification excused Elite's actions, (Docket Entry No. 75); and

- Elite's motion to exclude the testimony and expert report of Christian Knudsen, (Docket Entry No. 77).

The parties have submitted an extensive summary judgment record.[1]  Although much of the evidence is undisputed, there are genuine material factual disputes that are discussed in detail below. Based on the pleadings; the motions, responses, replies, and sur-replies; the record; the arguments of counsel; and the applicable law, the court denies each of the five motions for partial summary judgment, (Docket Entry Nos. 69, 72, 75, 76, 78), and grants in part and denies in part the motion to exclude Knudsen's testimony and report, (Docket Entry No. 77).  The parties are ordered to appear for a conference to set the schedule for resolving any remaining pretrial matters and the trial date.  The conference is set for **May 26, 2015,** at 4:30 p.m. in Courtroom 11-B.

The reasons for these rulings are set out below.

## I.    Background

Swellable packers are a long section of rubber wrapped around a piece of drill pipe and inserted into a wellbore.  (Docket Entry No. 69, Ex. A-1 at p. 15; Docket Entry No. 72, Ex. B).  The rubber swells when it interacts with either water or oil, creating a seal between the drill pipe and the wellbore.  (Docket Entry No. 69, Ex. A-1 at pp. 15, 35, 82–83).  Swellable rubber is made from a basic rubber-compound formula with a swelling ingredient added.  (Docket Entry No. 72, Ex. B at ¶ 10; Ex. B-1 at p. 10; Ex. C-4 at pp. 63–64; Ex. C-11 at p. 19).  Swellable-rubber elastomers are oil-swellable if they expand in oil or water-swellable if they expand in water.  (Docket Entry No. 72, Ex. C at ¶ 4; Ex. E at ¶ 4).  The technology for making oil- and water-swellable packers is publicly known, and many companies have developed "recipes."  (Docket Entry No. 72, Ex. B at

[1]  The parties have submitted evidence documenting Elite's development of the Tendeka compounds formulations and of the Swell X compounds formulations; reports and depositions from Paul McEldresh and Christian Knudsen, two technical experts; affidavits and depositions of individuals who participated in the testing, development, and manufacture of the compounds formulations at issue; internal e-mails relating to the development process; copies of contracts between the parties; and publicly available information about how swellable packers are made.

¶ 10; Ex. B-1 pp. 5–6; Ex. C-1 at pp. 24, 26–27; Ex. D at ¶ 5; Ex. H. at ¶ 37).  While many of these recipes are confidential, the basic ingredients of swellable-rubber compounds and the method for making them are publicly known.  (Docket Entry No. 72, Ex. A at ¶ 7; Ex. C-4 at pp. 63–64; Ex. C-11 at p. 19).  It is, for example, well known that a compounder can make rubber swellable in water by adding either salt or a super-absorbent polymer to the recipe.  (Docket Entry No. 72, Ex. A at ¶¶ 9–10; Ex. D at ¶ 6; Ex. C-9 at p. 21; Ex. F at ¶ 8).

Companies that develop and manufacture swellable packers collect data about well conditions from their oil and gas customers and test the compounds under those conditions.  (Docket Entry No. 72, Ex. E at ¶ 25; Ex. C-1 at pp. 56–57).  The American Society for Testing and Materials has developed industry-wide standards for testing rubber compounds.  (Docket Entry No. 72, Ex. A at ¶ 6; Ex. B at ¶ 8; Ex. B-1 at pp. 8–9; Ex. C-6 at p. 1; Ex. C-20).  "Coupon" testing is one of the industry-standard procedures.  A small sample of rubber, called a coupon, is soaked in either water or oil at a specified temperature, and the coupon's expansion is measured to evaluate how the rubber compound performed.   (Docket Entry No. 72, Ex. C-9 at p. 39; Ex. F at ¶¶ 40–42).

Tendeka B.V., a Dutch company, owns two subsidiaries, SwellFix UK, Ltd. and the plaintiff, Tendeka, Inc. ("Tendeka").  (Docket Entry No. 6, First Amended Complaint at ¶ 15).  Tendeka is responsible for Tendeka B.V.'s United States operations.  Tendeka sells swellable packers for use in oil-and-gas fracking.  (Docket Entry No. 72, Ex. A).  Tendeka does not make the packers itself.  Instead, Tendeka contracts with third parties to develop and manufacture the packers that Tendeka sells.  (Docket Entry No. 72, Ex. A at ¶ 5; Ex. C-10 at p. 390).

SwellFix, B.V. is now a Tendeka, Inc. sister company but was formerly its parent.  (Docket Entry No. 69 at p. 5; Docket Entry No. 71 at p. 6).  During the time SwellFix was Tendeka's parent,

4

SwellFix signed an Agreement with Shell to obtain a license for certain swellable-rubber compound recipes Shell had developed. Tendeka claims a license under the Agreement between Shell and SwellFix as a wholly owned subsidiary of SwellFix. Tendeka sublicensed these compounds to Elite Elastomers, Inc. to use in manufacturing rubber compounds for Tendeka's swellable packers.

Tendeka had previously worked with another rubber compounder, Ruma, which manufactured swellable-rubber compounds from its own proprietary recipe. (Docket Entry No. 72, Ex. E at ¶ 7; Ex. F at ¶ 21). Tendeka stopped working with Ruma and began working with Elite in 2009. (Docket Entry No. 72, Ex. A at ¶ 9; Ex. E at ¶ 17). Before then, Elite had experience in making rubber compounds but had not made swellable-rubber compounds. (Tendeka Ex. E at ¶ 2.7; Ex. F at pp. 10–13, 17, 19; Docket Entry No. 76, Ex. B at ¶ 3).

On October 30, 2009, Tendeka and Elite entered into a License and Supply Agreement ("LSA"). (Docket Entry No. 72, Ex. C-2). Under the LSA, Tendeka gave Elite a license to use the "Proprietary Compounds Formulations" that Tendeka claimed SwellFix had licensed it to use and to sublicense. Elite agreed to manufacture those compounds for Tendeka to use in its swellable packers. Elite was to sell the rubber compounds it made to Tendeka, which hired third parties to make the packers it sold. (Tendeka Ex. E at ¶¶ 2.7–2.9).

The LSA required both parties to protect the other's "Confidential Information." The LSA defined "Confidential Information" as follows:

> "(a) the Proprietary Compounds Formulations; (b) any confidential or other proprietary information, whether of a technical, business or other nature identified by the disclosing party as 'Confidential'; (c) any other information relating to the disclosing Party that is or should be reasonably understood to be confidential or proprietary; and (d) the terms of [the LSA].

(*Id.* at p. 1). The LSA defined the "Proprietary Compounds Formulations" as the compounds

licensed to SwellFix under its Agreement with Shell that SwellFix then licensed to Tendeka, as well as "any additional formulations for the manufacture of certain un-vulcanized elastomer compounds which may be provided by Licensor hereunder after the effective date."  (*Id.*).

Section 10(a) of the LSA describes each party's obligation not to disclose the other's Confidential Information.  Section 10(b) provides an exception from the § 10(a) obligations if the "Receiving Party"—here, Elite—shows that: "(i) the information disclosed to it was already known to it without obligation to keep it confidential; (ii) it received the information in good faith from a third party lawfully in possession thereof without obligation to keep such information confidential; (iii) the information was publicly known at the time of its receipt by it or has become publicly known other than by a breach of this Agreement; or (iv) the information was independently developed by it without use of the Confidential Information, as evidenced by contemporaneous documents."  (*Id.*).  Section 10(c) prohibits either party from using the other's Confidential Information "for its own benefit, or the benefit of any third party, or for any purpose not contemplated by this Agreement."  Elite argues that neither § 10(a) nor § 10(c) can apply to confidential information that is publicly known.

The LSA provided for an  initial five-year term with automatic renewal for successive one-year periods unless one party gave 60 days' advance notice that it did not want to renew.  (Docket Entry No. 76, Ex. A-1 at p. 226; Ex. A-3 at p. 4).

Tendeka and Elite amended the LSA on October 1, 2010.  (Docket Entry No. 76, Ex. A-1 at p. 85; Ex. A-2 at p. 210; Ex. A-12).  Under the amended LSA, Elite agreed to develop additional elastomer compounds for Tendeka.  In exchange, Tendeka stated its "intent" to have  Elite provide at least 90% of the proprietary rubber compounds Tendeka needed for its North and South American

markets.  (Docket Entry No. 76, Ex. A-3 at p. 18).

Tendeka provided Elite with "compounds in progress" after the parties signed the LSA. (Docket Entry No. 72, Ex. C-1 at pp. 45, 49, 63).  Elite personnel worked with one of Tendeka's rubber technologists, Jogesh Arora, to develop six water-swellable rubber compounds, labeled TWC-01 through TWC-06, for Tendeka to use in the manufacture of its packers.  (Docket Entry No. 72, Ex. B-1 at p. 11; Ex. C-25 at pp. 62–67).  Elite also developed two oil-swellable rubber compounds for Tendeka, labeled TOC-01 and TOC-02.  (Docket Entry No. 103 at p. 38).[2]

Neil Glover worked for SwellFix UK Ltd. as a product-line manager until November 2011. (Docket Entry No. 75, Ex. B, p. 219; Ex. C, p. 96).  Before leaving, Glover downloaded a large number of Tendeka and SwellFix documents from his work laptop to external drives.  (Docket Entry No. 86, Ex. B; Ex. T at pp. 42–47).  After leaving SwellFix, Glover formed a new swellable-packer company, Swell X.  (Docket Entry No. 75, Ex. A, p. 57).  Some of these documents he downloaded related to Swell X's business.  (*Id.*).

Swell X began working with Elite in the fall of 2012.  (Docket Entry No. 75, Ex. D, p. 165). Elite formed Packswell as a separate company to manage Elite's packer-manufacturing operations for Swell X.  (Docket Entry No. 72, Ex. C-25 at pp. 45–47).  Elite asserts that it took a water-swellable compound it had been working on internally and developed that compound to make a water-swellable rubber compound for Packswell to use in making packers for Swell X, which would sell them in competition with Tendeka.  (Docket Entry No. 75, p. 9; Docket Entry No. 76, Ex. B at ¶ 8; Docket Entry No. 86 at p. 10).  Elite spent 10 months developing the Swell X packer, testing

---

[2]  The record does not reveal whether the Tendeka oil-swellable compounds formulations were provided by Tendeka or developed separately by Elite.

42 different versions of swellable-rubber compounds.  (Docket Entry No. 76, Ex. B at ¶ 9).  Swell X gave Elite information on the downhole-reservoir conditions that the packer would need to operate in.  (Docket Entry No. 75, Ex. D. at pp. 246–47).  Glover also talked to Steve Glidewell, Elite's president, and reviewed Elite's research results.

Tendeka learned about Elite's discussions with Swell X in May or June of 2012.  (Docket Entry No. 76, Ex. A-1, pp. 117, 119, 126; Ex. A-4).  Elite and Packswell began selling swellable packers to Swell X in August or September 2012.  (*Id.*).

In this lawsuit, Tendeka asserts that Elite used information the LSA designated as Confidential Information—including the Proprietary Compounds Formulations—in developing the rubber compounds used to make swellable packers for Swell X.  Elite and Swell X assert that Elite independently developed the swellable-rubber compounds it manufactured for Swell X, relying on its own knowledge of rubber compounding and on publicly available sources.  Elite admits that in developing the compounds for Swell X, it ran tests comparing how the Swell X compounds performed compared to the oil-swellable compounds Elite made for Tendeka.  (Docket Entry No. 103 at pp. 27, 36, 40, 42, 49).  Elite denies that it conducted comparison tests on any of Tendeka's water-swellable compounds.  (*Id.*).  Elite also argues that much of the information it relied on to develop the swellable-rubber compounds for Swell X was publicly available.  (*See* Docket Entry No. 72).

In late November 2012, Tendeka learned that Swell X was selling swellable packers.  (Docket Entry No. 76, Ex. A-1 at pp. 129, 132).  In January 2013, Tendeka's CEO, Gary Smart, told his employees to stop all new research and development projects with Elite.  (Docket Entry No. 76, Ex. A-6 at pp. 83–84; Ex. A-7).  At roughly the same time, Tendeka asked for Elite's help in setting

up a rubber-mixing lab in Scotland.  (Docket Entry No. 76, Ex. A-1 at pp. 142–43; Ex. A-14).  Also in January 2013, Tendeka began searching for a new rubber manufacturer and asked Elite to send the compound formulations it used in making Tendeka's packers.  (Docket Entry No. 76, Ex. A-1 at pp. 153–55; Ex. A-8; Ex. B at ¶¶ 14–15).  By February 2013, Tendeka had hired Hexpol to replace Elite.  (Docket Entry No. 76, Ex. A-1 at pp. 161–64).

During a meeting at Tendeka's Houston offices in February 2013, Elite told Tendeka that it was working with Swell X.  Tendeka told Elite that it would be willing to continue the LSA if Elite ended its relationship with Swell X.  (Docket Entry No. 76, Ex. A-1 at pp. 164–65, 167, 179–80; Ex. A-2 at pp. 188–89).  The parties met again in April, but Tendeka did not tell Elite that it intended to terminate the LSA.  (Docket Entry No. 76, Ex. A-1 at p. 214).  Tendeka made its last purchase from Elite on May 29, 2013.  (Docket Entry No. 76, Ex. C at ¶¶ 4–6).

Tendeka sued Swell X and Glover in June 2013.  (Docket Entry No. 1).  On July 10, 2013, Tendeka sent Elite a letter accusing it of breaching the LSA and giving notice of termination for cause under paragraph 8(c).  (Docket Entry No. 76, Ex. A-1 at pp. 221–25; Ex. A-12).  Elite replied on July 23, 2013, stating that there was no point trying to mediate, that Elite was also willing to terminate the LSA, and that Elite would waive the 90-day notice period required for termination without cause.  "Subject to the foregoing," Elite agreed to terminate the LSA effective July 22, 2013.  (Docket Entry No. 76, Ex. A-13).

Tendeka amended its complaint in August 2013 to add claims that Elite breached the LSA's confidentiality and exclusivity provisions.  (Docket Entry No. 6).  Tendeka alleged that Elite was "aware that information supplied to it by Glover was confidential and proprietary" but used this "information to manufacture swellable packers for Glover and his company," Swell X.  (FAC at

¶¶ 29, 30).  Elite counterclaimed that Tendeka had breached the LSA by failing to buy at least 90%

of its swellable-rubber needs for North and South America from Elite.

Tendeka also asserted tortious interference with contractual relations against all three

defendants.  In prior rulings, the court dismissed all the claims against Glover.  The court also

dismissed the claims against all the defendants for tortiously interfering with Tendeka's customer

contracts.  The claims and counterclaims for breach of contract remain, as does Tendeka's claim

against Swell X for tortiously interfering with the LSA.  Tendeka alleges that Swell X "willfully and

intentionally interfered with [Tendeka's contractual] relationships by offering to sell to [various

oilfield services companies] swellable packers that [they] produced—in violation of the LSA—using

confidential and other proprietary information."  (*Id.* at ¶ 34).  Tendeka also alleges that Swell X

"willfully and intentionally induced Elite to breach" the obligations it owed Tendeka under the LSA.

(*Id*. at ¶ 35).  Tendeka seeks damages and a preliminary injunction preventing Elite and Swell X

from continuing to produce, market, and sell swellable packers.  (*Id*. at ¶¶ 36–43).

This memorandum and opinion addresses each pending motion for partial summary judgment

and the motion to exclude the report from Tendeka's designated expert witness.  The motions,

arguments, and responses are considered below.

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact."  *Triple Tee Golf, Inc. v.  Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks omitted). "'If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response.'" *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and explain how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.   Elite's Motions for Summary Judgment on Tendeka's Breach-of-Contract Claims

### A.       The Legal Standard for Breach of Contract

Under Texas law, which the parties agree applies, a court's primary concern in interpreting

a contract "is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "The objective intent as expressed in the agreement controls the construction of an unambiguous contract, not a party's after-the-fact conduct." *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006). The court considers the contract as a whole. *See id.* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999).

If the language, read as a whole, is "reasonably susceptible to more than one meaning," it is ambiguous. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). A court will not find a contract ambiguous if it is properly given a definite or certain legal meaning or interpretation. *J.M. Davidson*, 128 S.W.3d at 229. Ambiguity is present "only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of . . . two meanings is the proper" one. *R & P Enters. v. LaGuarta, Gavel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1989). "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).

"If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Nat'l Union*, 907 S.W.2d at 520. "When a contract is not ambiguous, the construction of the written instrument is a question of law for the court." *MCI Telecomm. Corp. v.*

*Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (*citing Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1982); *Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 657 (5th Cir. 2002)).

"[I]f the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, which creates a fact issue on the parties' intent." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). In those cases, "the interpretation of a contract is a question of fact" for the jury. *Fireman's Fund Ins. Co. v. Murchison*, 937 F.2d 204, 207 (5th Cir. 1991) (citing *Toren v. Braniff, Inc.*, 893 F.2d 763, 765 (5th Cir. 1991); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987)).

### B.      Did Elite Use "Confidential Information" as Defined in the LSA?

The 2009 LSA between Tendeka and Elite defines "Confidential Information" as: "(a) the Proprietary Compounds Formulations; (b) any confidential or other proprietary information, whether of a technical, business or other nature identified by the disclosing party as 'Confidential'; (c) any other information relating to the disclosing Party that is or should be reasonably understood to be confidential or proprietary; and (d) the terms of [the LSA]." (Docket Entry No. 72, Ex. C-2 at p. 1). Under the LSA, each party must refrain from disclosing the other's Confidential Information. (*Id.* at p. 5, § 10(a)). Each party must also refrain from using the other's Confidential Information for "its own benefit, or the benefit of any third party, or for any purpose not contemplated by [the LSA]." (*Id.* at p. 6, § 10(c)).

The parties vigorously dispute whether any of the six water-swellable compounds

formulations Elite developed for Tendeka, TWC-01 through TWC-06, or the two oil-swellable compounds formulations, TOC-1 and TOC-2, are protected as Confidential Information, either because they are "Proprietary Compounds Formulations" or because they are otherwise defined as confidential or proprietary under the LSA.

Section 1(b) of the LSA states that "'Proprietary Compounds Formulations' has the meaning set forth in the recitals." The recitals state that "Swellfix owns the worldwide, intangible legal rights and interests in and to the formulations for the manufacture of certain un-vulcanized elastomer compounds, which compounds are used in the manufacture of swelling packers (the 'Proprietary Compounds Formulations'), and has granted [Tendeka] the right to grant licenses with respect thereto." (Docket Entry No. 69, Ex. A-3).

Under the LSA, Tendeka gave Elite a sublicense to use the Proprietary Compounds Formulations SwellFix had licensed to Tendeka so that Elite could manufacture elastomer compounds for Tendeka. The record shows that Shell originally developed these elastomer compounds and licensed SwellFix, one of Tendeka's affiliated companies, the right to use and sublicense them. (Docket Entry No. 69, Ex. A-2; Ex. A-3). Tendeka alleges that the Shell license to SwellFix included an automatic sublicense or a right to issue a sublicense to its then-subsidiary, Tendeka, which in turn sublicensed the Proprietary Compounds Formulations to Elite.

Tendeka alleges that Elite breached the confidentiality provisions of the LSA by conducting comparison tests on Tendeka's swellable Proprietary Compounds Formulations to help develop competing swellable packers for Swell X. Elite does not dispute that it compared test results on Tendeka's oil-swellable Proprietary Compounds Formulations with test results on the compounds Elite was developing. Elite argues that this testing did not violate the LSA. First, Elite argues that

14

Tendeka had no protectable interest in the Proprietary Compounds Formulations because neither SwellFix nor Shell had given Tendeka the right to use or sublicense them.  Second, Elite argues that the LSA does not prohibit using publicly available information and that the composition, manufacturing steps, and test-performance data of Tendeka's oil-swellable Proprietary Compounds Formulations were widely known.  Third, Elite argues that it did comparison testing only on Tendeka's oil-swellable Proprietary Compounds Formulations, and that the stipulation the parties signed precludes Tendeka from asserting claims based on these compounds.[3]

### 1.   Did Tendeka Have a Contractual Right to Use or License the Proprietary Compounds Formulations?

The first issue is Elite's argument that the Tendeka Proprietary Compounds Formulations are not protected as Confidential Information under the LSA because Tendeka did not have the right to use or license those formulations so as to restrict Elite's right to use them.  Elite contends that SwellFix did not give Tendeka a license to use the Proprietary Compounds Formulations or to sublicense them to others and that Tendeka had no protectable interest in the compounds formulations that Elite used in conducting tests to develop the compounds formulations for Swell X.  (Docket Entry No. 69).

The information that the LSA refers to as the Proprietary Compounds Formulations was developed by Shell and licensed to SwellFix under its Agreement with Shell.  (Docket Entry No. 69, Ex. A-1).  The LSA between Tendeka and Elite stated that "Swellfix owns the worldwide, intangible legal rights and interests in and to the formulations for the manufacture of certain un-vulcanized

---

[3]   At the hearing on the summary judgment motions, Elite argued for the first time that the oil-swellable compounds were not Proprietary Compounds Formulations because Tendeka did not provide them to Elite.  Elite did not brief this argument in any of its several motions for summary judgment and has not pointed to summary judgment evidence in support.  The court's decision does not rest on this argument.

elastomer compounds, which compounds are used in the manufacture of swelling packers (the 'Proprietary Compounds Formulations'), and has granted [Tendeka] the right to grant licenses with respect thereto."  (Docket Entry No. 69, Ex. A-3).  Under the LSA, Tendeka agreed to sublicense these compounds formulations to Elite "for the sole purpose of facilitating [Elite's] manufacture of certain un-vulcanized elastomer compounds in accordance with such Proprietary Compounds Formulations (the 'Proprietary Compounds'), and to purchase such Proprietary Compounds from [Elite], in accordance with the terms and conditions of this [LSA]."  (*Id.*).

Tendeka argues that it obtained a license to use and sublicense the Proprietary Compounds Formulations through the Agreement between Shell and SwellFix.  Tendeka argues that it automatically received the license because the Agreement was signed by SwellFix, then Tendeka's parent company and now a Tendeka affiliate.  Both Tendeka and SwellFix are now owned by the same parent, Tendeka B.V., (Docket Entry No. 69, Ex. A-1 at p. 42), and Shell is a part owner of Tendeka.  The threshold issue is whether, as a matter of contract interpretation, the Agreement between Shell and SwellFix extended a license not only to SwellFix but also to Tendeka through SwellFix's ownership of Tendeka.

Clause 3.1 of the Agreement between Shell and SwellFix states:

> Subject to the rights of any third party and the restrictions imposed by any third party . . . SHELL hereby grants to SWELLFIX a royalty-bearing, exclusive (except as provided in Clause 3.2), sub-licensable and non-transferable (except as permitted in Clause 14 (Parties Bound/Assignment)) license to use the SHELL Intellectual Property to develop Products and Services and Processes and to manufacture, have manufactured, use and sell Products and to use Processes and provide Services and/or Commercialise in the Territory.

(Docket Entry No. 69, Ex. A-2).  The Agreement does not explicitly extend this license to SwellFix's affiliates.  But the Agreement does state that the royalties SwellFix must pay Shell are

based on the "Sales Revenue generated by SWELLFIX, any Affiliate of SWELLFIX and any other sublicensee of SWELLFIX during the previous year." (*Id.* at Clause 6.1(i)).  According to Clause 6.2, "[t]he royalties shall be due for Products provided by SWELLFIX or any Affiliate of SWELLFIX or any other sub-licensee of SWELLFIX and Processes used and Services rendered by SWELLFIX or any Affiliate of SWELLFIX or any other sublicensee of SWELLFIX." (*Id.* at Clause 6.2).

On the one hand, SwellFix's affiliates are not mentioned in the clause granting SwellFix a license to use the compound formulations.  The exclusive license is only to SwellFix.  On the other hand, royalties are calculated based on the affiliates' and any "other" sublicensees' sales.  The result is that the Agreement between Shell and SwellFix can reasonably be interpreted to mean that Shell did not grant SwellFix's affiliates, including Tendeka, the right to use or license the compound formulations, or to mean that Shell did include this right in the license it issued to SwellFix.  This ambiguity raises a factual dispute material to determining whether Tendeka had a protectable interest in the compound formulations Elite tested in developing competing packers for Swell X to sell.

Even if the Agreement between Shell and SwellFix is not properly interpreted to automatically give SwellFix's affiliates a license or sublicense to use the Proprietary Compounds Formulations, the parties dispute whether SwellFix later issued Tendeka a license for those formulations.  Alan Pearson, Tendeka's corporate representative, testified that SwellFix gave Tendeka a license to use the confidential and proprietary information Shell had licensed to SwellFix. (Docket Entry No. 69, Ex. A-1 at pp. 46–47).  Pearson testified that this license agreement was not in writing and was not an assignment. (*Id.*).  Pearson also testified that SwellFix did not ask Shell for permission to grant the license. (*Id.*).

17

Elite argues that this testimony is insufficient to support a finding that SwellFix gave Tendeka a license to use the compound formulations Shell had licensed to SwellFix in their Agreement.  Elite emphasizes that the Agreement required SwellFix to get Shell's written consent before assigning rights received under the Agreement.  (Docket Entry No. 69, Ex. A-2 at Clause 14.2).  But Pearson did not testify that SwellFix had assigned the license it received from Shell to Tendeka.  The Agreement requires Shell's consent before SwellFix could assign the license it received from Shell, but the Agreement did not require Shell's consent before SwellFix could issue a sublicense.

Elite also emphasizes that there is no summary judgment evidence of a written agreement from SwellFix granting Tendeka a license to use and to sublicense the compounds formulations SwellFix obtained by license from Shell.  Pearson's testimony raises a factual dispute about whether SwellFix did issue this license.  Elite has not met its burden of showing that based on the undisputed facts and as a matter of law, Tendeka was unable to sublicense the Proprietary Compounds Formulations it provided Elite under the LSA.  Elite's motion for partial summary judgment dismissing Tendeka's breach-of-contract claim based on the Agreement between Shell and SwellFix, (Docket Entry No. 69), is therefore denied.

### 2.    Does the LSA Protect the Proprietary Compounds Formulations?

Section 10(b) of the LSA, entitled "Exceptions," states as follows:

> *The obligations set forth in Section 10(a)* do not apply if and to the extent the Receiving Party establishes that: (i) the information disclosed to it was already known to it without obligation to keep it confidential; (ii) it received the information in good faith from a third party lawfully in possession thereof without obligation to keep such information confidential; (iii) the information was publicly known at the time of its receipt by it or has become publicly known other than by a breach of this Agreement; or (iv) the information was

18

independently developed by it without use of the Confidential
Information, as evidenced by contemporaneous documents.

(*Id.* at p. 6, § 10(b) (emphasis added)).

Elite argues that the § 10(b) exception applies both to the disclosure of Confidential Information under § 10(a) and to the use of Confidential Information under § 10(c). The language of § 10(b) does not support Elite's argument. Section 10(b) states that it applies to disclosures under § 10(a), but does not mention § 10(c), which restricts using Confidential Information. Under § 10(c), Elite would breach the LSA if it used Tendeka's Proprietary Compounds Formulations for its own benefit, for the benefit of any third party, or for any purpose the LSA did not contemplate. (*Id.* at p. 6, § 10(c)). Because § 10(b) does not apply to uses of Confidential Information under § 10(c), then, as a matter of contract interpretation, Elite is not entitled to summary judgment on the basis that the testing protocols, test-performance data, manufacturing processes, and key ingredients of the Proprietary Compounds Formulations were not Confidential Information because so much was publicly known. The issue is whether parties may contract to protect information by designating it as confidential if the information cannot be protected under trade-secret misappropriation law. The issue raises questions of both fact and law.

### 3. Could the Tendeka Oil-Swellable Proprietary Compounds Formulations Be Protected As Confidential?

The first question is one of fact. The parties dispute whether, and to what extent, the Proprietary Compounds Formulations were publicly known. Both parties focus their arguments on the six water-swellable Tendeka formulations. The parties appear to agree that the Tendeka water-swellable compounds formulations were not publicly known. The parties acknowledge that aspects of the Tendeka oil-swellable compounds formulations were either publicly known or capable of easy

replication based on publicly available information.  (Docket Entry No. 6 at pp. 8–9; Docket Entry No. 72 at p. 7).  The summary judgment record shows that some performance data on the Tendeka compounds, including swell-performance profiles, or "curves," was not secret.  Tendeka disclosed some performance data in brochures, quotes, and data sheets it provided to its customers.  (Docket Entry No. 72, Ex. C-26; Ex. C-27).  At the hearing at which counsel argued the summary judgment motions, Tendeka argued that under § 10(c) of the LSA, the oil-swellable compounds formulations were nonetheless entitled to the same protection as the water-swellable Proprietary Compounds Formulations.  (Docket Entry No. 103).  Tendeka relies on the § 10(c) prohibition against use of the Proprietary Compounds Formulations and other Confidential Information.

Elite admits that it ran comparison tests using Tendeka's oil-swellable compounds.  (Docket Entry No. 84, Ex. N, E-mail from Glidewell to Glover ("Attached are the comparison swells through Friday of the Swell XOS versus TOC-01.  Still looks good.")).  It is undisputed that Elite performed these comparison tests for its own and for Swell X's benefit, to assist in developing rubber compounds to make packers for Swell X to sell in competition with Tendeka.  (Docket Entry No. 103).  The LSA did not contemplate either purpose.

With respect to the water-swellable Proprietary Compounds Formulations, the parties dispute the extent of Elite's testing.  There is evidence in the present record from which a factfinder could reasonably infer that Elite conducted tests on Tendeka's water-swellable Proprietary Compounds Formulations for its own or for Swell X's benefit.  Some of the evidence shows that Elite conducted comparison testing but does not show whether the Tendeka compounds Elite used in the tests were oil-swellable or water-swellable.  (*See* Docket Entry No. 83, Ex. J, E-mails between Glidewell and Wickert ("I put the swell test on those Tendeka batches at 12:00.  The physicals and swell data will

20

be in the Tendeka folder in the T drive.  The worksheet is called Verification Swell Data 11-25-2013."); Docket Entry No. 83, Ex. M, E-mail from Wickert to Glidewell (describing testing "the Swell X plates" in "the bath that has the Tendeka test pieces in")).  Other evidence in the summary judgment record suggests that members of Elite's Swell X testing and development team worked with the Tendeka water-swellable Proprietary Compounds Formulations at the same time as they worked on the Swell X formulations.  (*See* Docket Entry No. 84, Ex. P, E-mail from Wickert to Glidewell ("I updated all the swells while I was doing the Swell X compounds.  They are already on the y drive.  I need to cure the tensiles for the shelf life today.  Did you ever decide what you wanted to do about the TWC-05 shelf life material?")).   Elite does not argue that the water-swellable compounds formulations are not protected.

The present record is insufficient to permit the court to rule as a matter of law that Elite did not run comparison tests on Tendeka's water-swellable as well as on its oil-swellable compounds formulations, using those Proprietary Compounds Formulations for purposes not contemplated by the LSA.

With respect to the oil-swellable compounds testing Elite conducted, the LSA supports Tendeka's argument that the information used was protected as a matter of contract interpretation.  The LSA defines Confidential Information specifically to include the Proprietary Compounds Formulations that Tendeka provided Elite.  By signing the LSA, Elite agreed not to use the Proprietary Compounds Formulations for purposes the LSA did not contemplate.  That leaves the question whether, despite the LSA's terms, there is a separate basis to conclude that, as a matter of law, a contract cannot be enforced to restrict the dissemination of information that is already publicly available—here, the oil-swellable Proprietary Compounds Formulations.

21

To show that the oil-swellable Proprietary Compounds Formulations and certain performance data about them do not deserve protection under the LSA, Elite relies on cases holding that information is not entitled to trade-secret protection if it has been publicly disclosed by the owner or by others. *See, e.g.*, *Interox America v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984) (noting that the owner had in the past voluntarily given third-party contractors manuals containing the technical information at issue and concluding that the information was not entitled to trade-secret protection); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dismissed) ("The word 'secret' implies that the information is not generally known or readily available." (internal citations omitted)); *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App.—Corpus Christi 1990, no writ) ("Courts have refused to give trade secret protection when the material or procedure sought to be protected has been publicly disclosed."); *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.—Fort Worth 1987, no writ) (concluding that the information was not a trade secret because the owner had previously disclosed it in contracts with its customers).

Elite does not cite a case addressing how the public availability of some or all of the disputed information affects a contract defining that information as confidential and restricting its use. Most of the cases Elite cites arise in the employment context. In the cited cases finding that publicly available information was not confidential or a trade secret, the parties' contracts did not designate the information as confidential or secret, and the claims were not for breaching contractual confidentiality provisions but for misappropriating trade secrets. *See, e.g.*, *T-N-T Motorsports*, 965 S.W.2d at 22; *H.E. Butt Grocery Co. v. Moody's Quality Meats*, 951 S.W.2d 33, 39 (Tex. App.—Corpus Christi 1997, writ denied); *Gonzales*, 791 S.W.2d at 264; *Numed*, 724 S.W.2d at 435;

*Peggy Lawton Kitchens, Inc, v. Hogan*, 466 N.E.2d 138, 140 (Mass. App. Ct. 1984).  By contrast, the issue here is breach of a contractual confidentiality obligation, which has different elements from, and involves a different analysis than misappropriation of trade secrets.  *See Mabrey v. SandStream, Inc.*, 124 S.W.3d 302, 315 (Tex. App.—Fort Worth 2003, no pet.) (the plaintiff asserted both breach-of-contract and trade-secret misappropriation claims, and the court analyzed the contractual protection against disclosure on the basis of the contract language, not the tort law on trade-secret misappropriation); *Purnell, Inc. v. Thyssen Industrie AG Henschel & Henschel Mixers Am., Inc.*, No. 01-95-00125-CV, 1995 WL 622919, at *6 (Tex. App.—Houston [1st Dist.] Oct. 19, 1995, no pet.) (noting that the plaintiff could have, but did not, extend confidentiality or trade-secret protections to certain information by requiring the defendant to sign a confidentiality agreement).

Tendeka's breach-of-contract claim depends on the existence and content of a written agreement.  The trade-secret misappropriation claims in the cases Elite relies on arise "apart from any written contract [] upon the formation of an employment relationship." *T-N-T Motorsports, Inc.*, 965 S.W.2d at 22 (citing *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—Amarillo 1995, no writ)).  In a trade-secrets misappropriation claim, "the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence." *Id.*  The scope of what is protected is determined by statutory and common-law requirements defining a trade secret. *Id.* (citing *Gonzales*, 791 S.W.2d at 265).  By contrast, in breach-of-contract claims, the scope of protection depends on the parties' intent, as expressed in their contract. *See Mabrey*, 124 S.W.3d at 315; *see also Celeritas Tech., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d at 1359–60 (Fed. Cir. 1998) ("Rockwell's third argument confuses the remedy for breach of contract with California statutory remedies for misappropriation of trade secrets.  It may

be true that in the absence of a contract, liability for Rockwell's misappropriation of Celeritas's trade secrets may be statutorily limited. . . . However, liability for breach of contract is not so limited."); *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 CIV. 9292 (DLC), 2008 WL 463884, at *15 (S.D.N.Y. Feb. 20, 2008) ("This argument appears to confuse the law of trade secret misappropriation with the law governing the instant claim for breach of contract.").  The cases Elite cites do not appear sufficient to support the result it seeks, given the present record.

And, perhaps most importantly, even under these and other Texas cases on misappropriation, a party's acquisition of confidential information or trade secrets is unlawful even if the same information could have been, but was not, legally obtained through publicly available sources.  *See M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 633 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (obtaining information by observation, experimentation, or general inquiry is lawful, but information is unlawfully obtained if it is gained through a breach of confidence); *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App.—Houston [1st Dist.] 1988, no writ) ("In Texas, courts condemn the employment of improper means to procure trade secrets.  The question is not, 'How could he have secured the knowledge?' but 'How did he?'" (citations and internal quotation marks omitted)), *withdrawn and stayed on other grounds*, 771 S.W.2d 562 (Tex. App.—Houston [1st Dist.] 1989, no writ); *see also Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 276 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.) ("The fact that [the information the plaintiff claimed was confidential] might have been available on the open market is not determinative.  The primary issue is whether the [defendants] engaged in a course of conduct to obtain access to confidential business information from the premises of [the plaintiff], without permission in order to facilitate the forming of their new corporation.").

Although Elite has presented evidence showing that some of the information about the ingredients and performance of Tendeka's compounds was publicly available, there is also evidence that Elite did not obtain the information it used to develop the Swell X formulation from the publicly available sources. Instead, Tendeka has presented evidence showing that Elite obtained some of the information it used to develop the Swell X compounds from the Proprietary Compounds Formulations Tendeka provided Elite under the LSA and through the comparison testing Elite conducted on those compounds without Tendeka's knowledge or permission. (Tendeka Exs. J, M, N, P). "The mere fact that knowledge of a product may be acquired through inspection, experimentation, and analysis does not preclude protection from those who would secure that knowledge by unfair means." *T-N-T Motorsports, Inc.*, 965 S.W.2d at 22 (citing *K&G Oil Tool & Serv. Co. v. G&G Fishing Tool Serv.*, 314 S.W.2d 782, 788 (Tex. 1958)).

The Texas cases and the present record do not permit finding that, as a matter of law, Elite did not breach § 10(c) of the LSA by using the Tendeka oil-swellable or water-swellable Proprietary Compounds Formulations for purposes not contemplated by the LSA.

### 4.   Did the Parties' Stipulation Limit Tendeka's Contract Claims?

Elite argues that the parties' November 2014 stipulation eliminated Tendeka's claims that Elite breached the LSA by testing Tendeka's oil-swellable Proprietary Compounds Formulations. (Docket Entry No. 72 at p. 37). The November 2014 stipulation defines the scope of the parties' claims. Tendeka stipulated that "its oil-swell formulation cannot, in this Action, be the subject of any claim against Elite or its affiliates or of any claim against Swell X, except to the extent that Elite has conducted comparison testing between Tendeka's and Swell X's oil-swellable compounds." (Docket Entry No. 70 at p. 2). Under this stipulation, Tendeka may assert claims against Elite and

its affiliates based on the tests Elite conducted comparing the performance of the Tendeka oil-swellable compounds against the oil-swellable compounds Elite was developing for Swell X.

The stipulation limits Tendeka's breach-of-contract claims based on its oil-swellable compounds to tests Elite ran comparing the performance of the compounds formulations Elite was working on for Swell X to the performance of the Tendeka oil-swellable Proprietary Compounds Formulations. (Docket Entry No. 103 at pp. 15–17). The parties' November 2014 stipulation does not, however, restrict any claims Tendeka may have over its water-swellable Proprietary Compounds Formulations and the tests Elite conducted on them.

### C.    Is There Evidence that Elite Did Conduct Comparison Testing?

Elite also moves for partial summary judgment dismissing Tendeka's breach-of-contract claim based on Elite's comparison tests on the oil- and water-swellable Proprietary Compounds Formulations to accelerate the development of the Swell X compound. For the reasons explained above, the present record is insufficient to permit the court to rule as a matter of law that Elite did not run comparison tests on Tendeka's water-swellable as well as on its oil-swellable compounds formulations, using those Proprietary Compounds Formulations for purposes not contemplated by the LSA.

### D.    Damages

Elite and Swell X both argue that Tendeka cannot proceed on its claims because it has not presented adequate proof of damages. Tendeka responds that it failed to particularize its damage claims because Swell X failed to disclose complete information about who purchased Swell X packers and how much revenue Swell X earned from those sales.

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure states that a party must provide

"a computation of each category of damages claimed [and] make available for inspection and copying . . . the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based."  A party who fails to comply "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(1).  "A party claiming damages has the obligation, when it makes its initial disclosures, to disclose to the other parties the best information then available to it concerning that claim, however limited and potentially changing it may be."  *Joseph v. Las Vegas Metro. Police Dep't*, No. 2:09-cv-0966-HDM-LRL, 2010 WL 3238992, at *2 (D. Nev. Aug. 13, 2010); *see also City & Cnty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219 (N.D. Cal. 2003) (recognizing that Rule 26(a)(1)(c) anticipates supplemental disclosures with ever-greater level of detail as discovery progresses).  The record does not provide a basis for this court to conclude that Tendeka has withheld information or documents it used to calculate damages.  *Cf. Bessemer & Lake Erie R.R. Co. v. Seaway Marine*, 596 F.3d 357 (6th Cir. 2010) (affirming a district court's grant of summary judgment to the defendant on the plaintiff's damages claim because the plaintiff had failed to timely disclose a "critical factor" in its lost-profits claim and withheld information on which it based its damages calculations).

Tendeka's corporate representative testified at his deposition that its damages measure was Elite and Swell X's profits from selling swellable packers and swellable-rubber compounds. (Docket Entry No. 72, Ex. C-1 at p. 295).  Tendeka used discovery to seek the Swell X sales information, without success.  The individuals available to Tendeka to depose, including Glover, did not know how many packers Swell X sold in 2014.  (Tendeka Ex. T at p. 89).  Tendeka served Swell X with interrogatories asking about packer sales volume, pricing, and customers.  (Tendeka

Ex. X).  Although the deadline for responding was after the discovery deadline, Swell X did not

object or otherwise respond.  (Docket Entry No. 81 at p. 24).  At a pretrial conference held in court

on August 15, 2014 to address discovery disputes, Tendeka sought an order requiring Swell X to

provide documents relating to its sales as relevant to damages.  Swell X and Glover responded that

the documents could not be produced because they were on a computer seized by a court in Scotland

and subject to strict confidentiality.  The court ordered the defendants to produce the requested

documents for attorneys' eyes only.  Swell X and Glover did not produce all of the documents

Tendeka requested.  They also did not provide specific information about sales figures through their

corporate representatives' deposition testimony.  (*See* Tendeka Ex. T).  After the August 15, 2014

hearing, Tendeka objected to interrogatories asking about its actual damages because it did not have

sufficient Swell X sales and pricing information.  Tendeka stated that when it had the necessary

information, it would calculate damages based on "the sales of water-swellable packers to existing,

former, and prospective customers that Tendeka lost to Swell X."  (Docket Entry No. 81, Ex. W-1

at pp. 5–6).  The parties' discovery disputes make it inappropriate to grant summary judgment

dismissing Tendeka's claims on the basis that it has not provided a more precise accounting of its

damages.

       In sum, the present summary judgment record presents factual disputes that preclude ruling

that, as a matter of law, Tendeka cannot recover on its claim that Elite breached § 10(a) of the LSA

by using the Proprietary Compounds Formulations Tendeka provided.  A full record on the

underlying factual issues is important to an accurate resolution of the motions for partial summary

judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest

. . . that the trial court may not deny summary judgment in a case where there is reason to believe

that the better course would be to proceed to a full trial.").

Elite's motion for summary judgment on Tendeka's breach-of-contract claims, (Docket Entry No. 72), is denied.

## IV.    Swell X's Motion for Summary Judgment

Swell X moves for summary judgment dismissing Tendeka's tortious-interference claims on the basis that Tendeka has not presented sufficient evidence to show that Swell X induced Elite to violate the LSA's confidentiality provisions.

A claim for tortious interference with an existing contract under Texas law requires proof of "(1) the existence of a contract subject to interference, (2) willful and intentional interference (3) that proximately causes damage, and (4) actual damage or loss." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009, pet. denied). "For a plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract." *Id.* at 532. "The plaintiff must present evidence that a contract provision was breached." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 674–75 (S.D. Tex. 2010) (citing *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.)); *Archives of Am., Inc. v. Archive Litig. Servs., Inc.*, 992 S.W.2d 665, 667–68 (Tex. App.—Texarkana 1999, pet. denied). "Like contract interpretation, tortious interference with contract is a mixed question of law and fact." *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995).

Swell X argues that there is no evidence showing that Glover or Swell X took, used, or shared Tendeka's Confidential Information, or that Swell X was involved in Elite's development of the Swell X compounds and packers.  (Docket Entry No. 75 at pp. 12, 16–17).  Tendeka has

29

submitted evidence showing that Glover prepared a document on how to build a packer, reviewed the rubber packers' test results, and discussed testing methods with Elite president Steve Glidewell. (Docket Entry No. 86, Ex. T at pp. 108–09, 113–14).  This evidence supports an inference that Swell X was more than a passive beneficiary of Elite's development efforts.  Tendeka has pointed to at least some evidence showing that Swell X and Glover asked Elite to develop the compounds and packers and were involved in teaching Elite how to make them.  There are factual disputes material to deciding whether Swell X knowingly interfered with the LSA.

Swell X also moves for summary judgment on Tendeka's claims based on the affirmative defense of justification.  Swell X argues that it could compete with Tendeka as long as it did not use Tendeka's Confidential Information to do so.  The court has found factual disputes material to deciding whether and to what extent Elite used Tendeka's Confidential Information—the Proprietary Compounds Formulations—to make swellable-rubber compounds for Swell X's packers.  The evidence Tendeka has pointed to showing that Swell X was involved in Elite's development of the Swell X packers also raises factual disputes material to deciding whether Swell X used Tendeka's Confidential Information to compete with Tendeka.  "The defense of justification is not applicable when there is interference by illegal or tortious means," including the misuse of confidential information.  *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 218 (Tex. App.—San Antonio 2013, pet. denied).  The summary judgment record reveals factual disputes that preclude summary judgment in Swell X's favor on Tendeka's tortious-interference claims.

The claims against Swell X are intertwined with the claims against Elite.  If Elite did not breach the LSA, then Swell X did not induce Elite to breach it.  (Of course, a jury could find that Elite breached without Swell X's inducement.)  A full trial record on Tendeka's breach of contract

30

claims against Elite is important to an accurate resolution of Tendeka's tortious-interference claim against Swell X.  Based on the present record, Swell X's motion for summary judgment, (Docket Entry No. 75), is denied.

## V.      Elite's Breach-of-Contract Counterclaim

Elite alleges that Tendeka breached the LSA by failing to purchase 90% of its rubber needs from Elite, by working with another rubber supplier, and by not paying its invoices on time. Tendeka argues that Elite breached the LSA first, justifying Tendeka's termination.  Tendeka also argues that the minimum-purchase percentage was aspirational rather than binding; that the parties had agreed to terminate the LSA before Tendeka stopped buying rubber from Elite; and that the LSA bars the type of damages Elite claims. Elite has moved for summary judgment that it is entitled to relief on its counterclaim, and Tendeka has cross-moved to dismiss the counterclaim.

### A.      Elite's Motion for Summary Judgment

The court has found factual disputes material to determining whether Elite breached the LSA by using Confidential Information for its own or for Swell X's benefit.  These disputes also preclude summary judgment on Elite's counterclaims.  The parties agree that if Elite breached the LSA's confidentiality provisions as Tendeka alleges, Elite cannot recover for breach based on the fact that Tendeka turned to a new rubber supplier.  (Docket Entry No. 103 at p. 63; Docket Entry No. 76 at p. 11; Docket Entry No. 89 at p. 5).

Elite has also presented evidence that Tendeka frequently paid its invoices after the 45-day period the LSA provided for payment.  (*See* Docket Entry No. 76, Ex. B at ¶¶ 20–24).  But Elite did not assert this claim in its amended answer and counterclaim, (Docket Entry No. 48).  Elite cannot obtain summary judgment on claims it did not plead.  *See U.S. ex rel. Gudur v. Deloitte Consulting*

31

*LLP*, 512 F. Supp. 2d 920, 956 (S.D. Tex. 2007) (holding that a relator-plaintiff could not defeat summary judgment on his conspiracy claim by raising a new factual basis for the claim for the first time in his summary judgment response); *Allstate Ins. Co. v. Plambeck*, No. 3:08-CV-0388-M-BD, 2012 WL 2130982, at *3 (N.D. Tex. Jan. 4, 2012) ("[Plaintiffs] are bound by the representations of their attorney and will not be permitted to rely on an unpled theory of recovery to defeat summary judgment."); *Vetromile v. JPI Partners, LLC*, 706 F. Supp. 2d 442, 455 (S.D.N.Y. 2010) ("A party may not automatically raise a claim at summary judgment that he did not plead"); *see also Benavides v. EMC Mortg. Corp.*, No. 3:12-cv-0046, 2013 WL 416195, at *4 (S.D. Tex. Jan. 31, 2013).  The court cannot grant summary judgment for Elite on this counterclaim.

### B. Tendeka's Cross-Motion for Summary Judgment on Elite's Counterclaim

### 1. Consequential Damages

 In addition to arguing that Elite breached the LSA, Tendeka also argues that the LSA does not permit Elite to recover the damages it seeks for lost profits.  The LSA includes the following clause restricting damages:

> Consequential Damages. EXCEPT WITH RESPECT TO BREACHES OF THE PROVISIONS OF SECTION 10 OF THIS AGREEMENT, IN NO EVENT SHALL [TENDEKA] BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL (INCLUDING LOST PROFITS), SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THE PROPRIETARY COMPOUNDS FORMULATIONS OR THE PROPRIETARY COMPOUNDS EVEN IF NOTICE WAS GIVEN OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF SUCH DAMAGES WERE REASONABLY FORESEEABLE.

(§ 13).

 Tendeka argues that this provision precludes recovery for any claim based on lost profits.  The provision bars recovery of incidental, consequential, special, punitive, or exemplary damages,

and categorizes lost profits as a form of consequential damages. The provision does not bar claims for direct damages. Elite seeks damages for the profits it would have earned from sales of proprietary rubber compounds to Tendeka under the LSA. These lost profits are direct, not consequential, damages. *See Cherokee Cnty. Cogeneration Partners L.P. v. Dynegy Mktg & Trade*, 305 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("profits lost on the contract itself—such as the amount a party would have received on the contract minus its saved expenses—are direct damages"); *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet. denied). The LSA's bar on recovering consequential damages does not preclude Elite's claim for lost profits or entitle Tendeka to summary judgment in its favor on Elite's counterclaims.

### 2.    Termination

Tendeka also claims that the parties agreed to terminate the LSA in July 2013, when Elite's counsel sent Tendeka a letter seeking to end the parties' relationship. Tendeka argues that even if Elite did not breach the LSA, it agreed to terminate the LSA without cause on July 22, 2013, and Tendeka complied with all of its contractual obligations through that date. Elite argues that the evidence showing an agreement to terminate the LSA on that date is inadmissible.

On July 10, 2013, Tendeka wrote to Elite, saying that it was terminating the LSA for cause, based on Elite's contract breach. Tendeka invoked the LSA provisions requiring mediation before litigation. The letter stated:

> It has come to our attention that Elite has violated the confidentiality provisions of paragraph 10 and paragraph 5(b) of the LSA. Accordingly, and pursuant to paragraph 8(c) Tendeka hereby terminates the LSA. As the breaches referenced above are not capable of being cured, no cure period is provided.
> . . .
> We further invoke paragraph 19 of the LSA requiring medication [sic] of disputes. We suggest mediation in Houston, Texas before

> Gary McGowan.  Please inform us in writing whether you agree to the terms by close of business on July 22, 2013.  If you do not respond, Tendeka will assume that Elite is unwilling to mediate.

(Docket Entry No. 78, Ex. A).

Elite responded through trial counsel on July 23, 2013.  (Docket Entry No. 78, Ex. B).

Elite's president reviewed the response before counsel sent it.  (Docket Entry No. 78, Ex. C).  The

letter stated:

> We have been asked to advise you that the allegations made by Tendeka, Inc. in the Letter alleging that Elite violated certain provisions of the Agreement are false, and Elite hereby denies undertaking any action which violated these or any other provisions in the Agreement.  To the extent that Tendeka has some proof of these allegations, please forward them to the undersigned.

> Given the deterioration of the relationship between Tendeka, Inc and Elite, Elite has no interest in forcing Tendeka, Inc to comply with the notice provisions of the Agreement or to continue the supply arrangement anticipated by the Agreement.

> Please be advised that Elite is willing to waive the requirement for ninety (90) days prior written notice by Tendeka, Inc for a termination without cause and, as a result, will treat the Letter as a termination of the Agreement without cause by Tendeka, Inc.

> As it is clear that both parties have agreed that the Agreement be terminated, there is no benefit of entering into any sort of further proceeding or mediation as there is no dispute as to the desire of either party to continue the Agreement.

> Subject to the foregoing, Elite does agree to the termination of the Agreement as of July 22, 2013.

(Docket Entry No. 78, Ex. B).

Elite argues that the letter is inadmissible under Rule 408 of the Federal Rules of Evidence

because the words "subject to the foregoing" conditioned Elite's agreement to terminate the LSA

on July 22, 2013, without the 90 days' notice required to terminate without cause.  The condition

for waiving the notice was Tendeka's agreement to neither mediate nor sue.  Rule 408 prohibits evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim" to prove or disprove the validity of a disputed claim.  FED. R. EVID. 408.  Inadmissible evidence cannot be considered on a summary judgment motion.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004).

Elite correctly argues that it wrote its letter in the context of litigation and offered valuable consideration—an offer to terminate the LSA immediately, waiving the 90-day notice period for termination without cause—in exchange for Tendeka's agreement not to pursue mediation or "other proceeding[s]."  But this does not end the inquiry.  Rule 408 does not prohibit all uses of settlement offers.  Instead, Rule 408 prevents a party from proving or disproving the validity of "a disputed claim" by introducing evidence of "valuable consideration in compromising or attempting to compromise *the claim*."  FED. R. EVID. 408 (emphasis added).

"Rule 408 unambiguously requires that the claim as to which a settlement offer was made and the claim at issue in the litigation in which the offer is proffered as evidence must be the same claim."  *Armstrong v. HRB Royalty, Inc.*, 392 F. Supp. 2d 1302, 1304–05 (S.D. Ala. 2005); *see also Towerridge Inc. v. T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997) ("Rule 408 does not require the exclusion of evidence regarding the settlement of a claim different from the one litigated." (citing *Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992)); *Ostrow v. GlobeCast Amer. Inc.*, 825 F. Supp. 2d 1267, 1273 (S.D. Fla. 2011) ("In other words, use of the phrase 'the claim' limits the rule's application to the same claim as first anticipated by use of the phrase 'a claim.'  And the phrase 'when offered to prove liability for, invalidity of, or amount of'

35

qualifies the term 'a claim,' requiring that term to refer only to the claim under litigation in the pending case.").

Tendeka is not using the July 23, 2013 letter to prove or disprove the validity or amount of the claim that letter attempted to settle: Tendeka's claim that Elite breached the LSA's confidentiality provisions.  Tendeka is using the letter to disprove Elite's separate counterclaim that Tendeka breached the LSA by failing to order 90% of its North and South American rubber needs from Elite after May 29, 2013.  This counterclaim is distinct from Tendeka's confidentiality claim and does not arise from the same transaction as the claim Elite offered to settle.  *See PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 115–16 (2d Cir. 2008) (representations made by the plaintiff in negotiations to settle the plaintiff's infringement claim were admissible to prove the validity of the defendant's estoppel counterclaim based on those representations because the elements of the two claims were distinct); *Cates v. Morgan Portable Bldg. Corp.*, 708 F.2d 683 (7th Cir. 1985) (settlement negotiations could be used to prove the fact of settlement but not the validity of the underlying claim); *Thomas v. Resort Health Related Facility*, 539 F. Supp. 630, 638 (E.D.N.Y. 1982) (the defendant's offer to settle the plaintiff's discrimination claim by reinstating him was inadmissible as to that claim under Rule 408, but was admissible to prove the amount of the plaintiff's separate claim for back pay).

Elite's July 23, 2013 letter did not offer to settle Elite's counterclaims or even mention a possible claim based on the 90% purchase requirement or based on Tendeka's conduct after July 22, 2013.  Elite did not assert these counterclaims until September 17, 2013.  (Docket Entry No. 21). *See Armstrong*, 392 F. Supp. 2d at 1305–06 ("one can hardly dispute a claim of which he is unaware," and the claim was not disputed at the time of the settlement offer because the parties'

differences of opinion on the validity of the claim were unexpressed).

The July 23, 2013 letter is inadmissible to prove that Elite breached the LSA by violating its confidentiality provisions. The letter is, however, admissible to show whether the parties terminated the LSA in July 2013, in October 2013 (after the 90-day notice period required for termination without cause), or on a different date.

### 3.      The 90% Purchase Requirement

Tendeka also argues that it is entitled to summary judgment on Elite's counterclaims because the LSA did not require Tendeka to purchase 90% of its rubber needs from Elite. The parties' 2010 amendment to the LSA states that "[i]t is [Tendeka's] intent to have 90% or more of the Proprietary Compounds for the North and South American region—including the United States—manufactured by [Elite]." But the LSA also states that "[n]othing herein shall be construed to . . . require [Tendeka] to purchase any particular quantity of Proprietary Compounds from [Elite]." (Docket Entry No. 78, Ex. D). Tendeka argues that the second sentence makes the reference to a 90% purchase requirement aspirational rather than mandatory.

Tendeka's proposed interpretation makes the reference to a 90% purchase requirement meaningless. Elite's proposed interpretation is that the first sentence requires Tendeka to purchase a certain percentage of its needs, while the second sentence makes clear that this does not require Tendeka to purchase a particular amount. Elite's proposed interpretation gives meaning to both the provision requiring Tendeka to purchase 90% of its Propriety Compounds Formulations needs for North and South America and to the provision that Tendeka is not required to purchase any particular quantity from Elite.

Assuming there was a minimum-percentage requirement, the parties dispute how it should

be applied.  Elite argues that the LSA did not end until October 2014, but Tendeka did not purchase rubber compounds from Elite after May 2013.  Elite argues that Tendeka failed to meet the 90% purchase requirement because it purchased none after May 2013.  Tendeka responds that it purchased 90% of its rubber needs from Elite between 2010 and July 2013, when it argues the LSA ended, either because the parties agreed to terminate it then or because of Elite's material breach.  Alternatively, Tendeka argues that it purchased 90% of its rubber needs from Elite through October 2013, when the LSA terminated if Elite's July 23, 2013 letter gave notice that it treated Tendeka's July 10, 2013 letter as a notice of termination without cause.

The LSA does not state how the 90% requirement should be calculated, and the parties have not pointed to evidence supporting their competing arguments.  The factual disputes material to determining whether Elite breached the LSA and when it terminated, ending Tendeka's obligation to honor the 90% requirement, preclude summary judgment on the dispute over this requirement.

### C.    Summary

Multiple factual disputes material to determining whether Elite breached the LSA, whether and when the parties agreed to terminate the LSA, and whether Tendeka violated the 90% purchase requirement make summary judgment in either party's favor improper.  The cross-motions for summary judgment on Elite's counterclaims are denied.

## VI.    The Motion to Exclude Christian Knudsen's Testimony

Elite moves to exclude and strike the report and testimony of Christian Knudsen, Tendeka's designated expert witness.  (Docket Entry No. 77).  Knudsen expressed the opinion that Elite relied on Tendeka's Confidential Information to accelerate its development of the Swell X compound formulation.  Elite argues that Knudsen is not qualified to testify as an expert because he lacks

38

experience in the rubber industry generally and in swellable-rubber technology in particular, and that Knudsen's opinions are based on unverified facts, on unreliable methodology, and on common sense rather than expert knowledge.

> A witness qualified as an expert may give an opinion or other expert testimony if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "[C]ourts are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant."  *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible.  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 385 (5th Cir. 2009) (citation omitted).  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue."  *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).  The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.  The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case."  *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  In making its

reliability determination, the court should not decide the validity of the expert's conclusions, but should instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594–95; *Paz*, 555 F.3d at 388.

Elite admits that Knudsen, a chemical engineer, is qualified as a chemist by his training and experience. Knudsen has a B.A. and a B.S. in chemical engineering from Rice University, and an S.M. and an Sc.D. in Chemical Engineering from the Massachusetts Institute of Technology. (Docket Entry No. 77, Ex. A, p. 16). He has served as an expert witness in numerous matters involving chemistry and chemical formulations. (*Id.* at pp. 16–18; Docket Entry No. 77, Ex. B at pp. 19–21). But Elite argues that Knudsen's general chemistry experience is irrelevant to the more specific field of rubber compounds and, in particular, swellable-rubber compounding. Knudsen's only prior experience with rubber compounding was on a patent-infringement case that dealt with a different type of rubber. (Docket Entry No. 77, Ex. B at pp. 20–21).

Although Knudsen does not have experience in the specialized field of swellable-rubber compounding, his chemistry experience is more than sufficient to qualify him to opine on the chemical formulations at issue here. The parties' arguments have focused on chemical testing and compounding. Knudsen has extensive experience in this field; his lack of specific experience in swellable rubbers, as opposed to non-swellable rubbers or other chemical compounds, does not make his testimony unhelpful to the jury. "Any further deficiencies in [Knudsen's] qualifications, such as the lack of specialized training . . . , goes to the weight of his testimony rather than its admissibility." *USAA Cas. Ins. Co. v. Metro. Edison Co.*, No. 1:12-CV-1178, 2014 WL 3534946, at *7 (M.D. Pa. July 16, 2014); *see also Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Rule

702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." (citing *Daubert*, 509 U.S. at 596)).

*Wright Asphalt Products Co., LLC v. Pelican Ref. Co., LLC*, No. Civ. A. H-09-1145, 2012 WL 1936416, at *4 (S.D. Tex. May 29, 2012), does not suggest otherwise. That case involved allegations that the defendant had infringed a patent describing a process for making asphalt products. The defendant named a mechanical engineer as an expert, and the plaintiff moved to exclude his testimony. This court granted the motion to exclude, finding that the engineer's expertise in fluid dynamics did not provide necessary knowledge about the asphalt industry. Although the engineer's more specific knowledge of fluid mechanics might have been relevant to understanding some parts of the patent at issue, he did not have the information about asphalt and binder formulation necessary to assist the jury in understanding critical parts of the patent and the technology at issue. The court also rejected the defendant's argument that the witness could testify as an expert as to the one part of the patent he was qualified to discuss.

By contrast, Knudsen's general knowledge of chemistry and chemical compounding enables him to understand and offer an opinion on whether Elite independently developed the Swell X compound or improperly used information gathered through comparison testing to create it. Knudsen's lack of specific experience in swellable-rubber technology does not make his opinions on this subject unreliable so as to exclude them under Rule 702.

Elite objects that Knudsen did not independently verify the facts he used for his report and testimony. Instead, Knudsen based his opinions on the facts Tendeka pleaded in its original and amended complaints. Elite notes that parts of the introduction of Knudsen's report are identical to

portions of Tendeka's complaint.  But Knudsen's report shows that he reviewed the record evidence and based his opinion on the evidence he found reliable.  (Docket Entry No. 77, Ex. A at pp. 8–9). Knudsen was not required to independently verify the data he relied on.  *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, No. 09-cv-261, 2014 WL 1350720, at \*7 (W.D. Wis. Apr. 4, 2014); *Martinez-Morales v. Victaulic Co.*, No. Civ. 11-1660 MEL, 2013 WL 2443870, at \*2 (D.P.R. June 5, 2013).

Elite also moves to exclude parts of Knudsen's report and testimony that are based on unreliable methodology or only on "common sense."   Knudsen explained the grounds for his opinion that Elite relied on Tendeka's Confidential Information to accelerate its development of the Swell X compound.  Knudsen then stated that his opinion was confirmed by the fact that Elite presented more pages of testing records for its development of the Tendeka compounds than it did for its development of the Swell X compound.  (Docket Entry No. 77, Ex. A at p. 8).  When Knudsen was asked about this part of his report during his deposition, he testified that he did not rely only on the difference in page volume, but also on the fact that "one [set of testing records] follows the other and uses the same data sheets and the same experience and knowledge that was gained during the Tendeka developments."  (Docket Entry No. 77, Ex. B at pp. 109–10).  Knudsen's report, as supplemented by his testimony, shows that he did not rely only on a comparison of the number of pages, but also on his chemical-engineering experience and his specialized knowledge of the chemical-development process.

Knudsen also stated in his report that his opinion was further confirmed by the fact that Elite changed its website between 2011 and 2014 to focus marketing more on the oil and gas industry and on swellable-rubber products.  (Docket Entry No. 77, Ex. A at p. 8).  During his deposition, Knudsen

42

acknowledged that this was not a "technical" point, but "just a common sense assumption."  An expert's testimony about "common-sense assumptions" does not assist the jury.  *See United States v. Zajanckauskas*, 441 F.3d 32, 39 (1st Cir. 2006) ("Expert testimony does not assist where the [trier of fact] has no need for an opinion because it easily can be derived from common sense, common experience, the [trier of fact's] own perceptions, or simple logic" (alternations in original)); *Jones v. Pramstaller*, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) ("To the extent that Dr. Walden's arguments are based on common sense rather than his own expertise and experience, they will not be helpful to the jury."); *U.S. Bank Nat'l. Ass'n. v. James*, 741 F. Supp. 2d 337, 343 (D. Me. 2010) ("'Expert' testimony about matters of common sense is not helpful to a jury and carries the risk of unfair prejudice."); *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 417 (W.D.N.Y. 2005) (excluding an expert's opinions "based in large part on common sense and facts which would be obvious to any reasonable adult"); *see also* WRIGHT & MILLER, 29 FEDERAL PRACTICE & PROCEDURE EVIDENCE § 6264 (an expert witness's testimony is not helpful "where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic").  Knudsen stated that this part of his report was not based on his technical expertise but on common sense.

Knudsen's opinions based on common-sense observations are not admissible under Rule 702.  Elite's motion to strike the portions of Knudsen's report and deposition testimony opining about changes to Elite's website is granted; the motion to strike is otherwise denied.

## VII.  Conclusion

The motions for partial summary judgment, (Docket Entry Nos. 69, 72, 75, 76, 78), are denied.  The motion to exclude Knudsen's testimony and report, (Docket Entry No. 77), is granted

in part and denied in part.  The parties are ordered to appear for a conference to set a schedule for

completing any remaining pretrial matters and for trying this case.  The conference is set for **May

26, 2015**, at 4:30 p.m. in Courtroom 11-B.

SIGNED on May 11, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

44